E-FILED
Tuesday, 31 July, 2012  04:20:14 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **VICCI KINNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 10-CV-02238** |
| **KEITH ANGLIN, CORY FOSTER,** | ) | |
| **GLADYSE TAYLOR, and** | ) | |
| **JIM REINHART,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#25) filed by the Defendants, Keith Anglin, Cory Foster, Gladyse Taylor and Jim Reinhart. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Defendants' Motion for Summary Judgment (#25) is GRANTED in part and DENIED in part.

## FACTS[1]

### I. Plaintiff's Employment Background

Plaintiff, Vicci Kinney, was hired by Lake Land College ("LLC") to work as an instructor at the Danville Correctional Center ("DCC") on April 1, 2003. Prior to her employment with LLC, Plaintiff worked as an adjunct faculty member at the Danville Area

---

[1]The facts are taken from the parties' statements of undisputed facts and the documents submitted by the parties. This court has only included material facts which are adequately supported by evidence in the record.

Community College where she taught classes in electronics and vocational math. Plaintiff, after starting in her role working as a full-time instructor at DCC, taught classes in a variety of specialities, including construction, electricity and plumbing.

Plaintiff taught her classes in a large classroom which had an attached office. Plaintiff was able to see part of her classroom from her office, however, due to large structures that were being used by the students as part of her classes, her view of the computers was obstructed. The classroom had one operable computer during the time in question, which was permitted to be used by her students for a limited purpose—to use a computer program to construct a home.[2] Plaintiff had no responsibility for maintaining the computers in her classroom.

## II. Birdhouse & Solitaire "Controversies"

On April 3, 2009, Plaintiff received a letter from her supervisor at LLC—Mary Nichols ("Nichols")—indicating that Assistant Warden Victor Calloway ("Calloway") had requested that Plaintiff's class build birdhouses that would eventually be given away as gifts to DCC visitors. Plaintiff immediately had concerns about using her class funds for this project and advised Nichols that there would not be sufficient time to build the birdhouses by the end of April, as requested by Calloway. On April 6, 2009, Nichols relayed the message to Calloway that the birdhouses could not be completed by the end of April. Calloway then requested that the birdhouses be complete by the time of future tours (sometime after the end

---

[2]Although the computers were only to be used for this limited purpose, an inmate was caught playing a computer game in 2006. As a result, the facility hired someone to ensure that all computer games had been removed from all computers in the facility.

2

of April).  Later that day, Nichols advised Plaintiff that the requested birdhouses should be

completed by June 1, 2009.  Plaintiff continued to believe that this request was an

inappropriate use of funds allocated to her classroom and contacted the Department of

Corrections ("DOC") hotline on April 7, 2009.  A representative on the DOC hotline

informed Plaintiff that she could contact the Illinois Office of the Executive Inspector

General ("OEIG") about her concerns.  On April 8, 2009, at 7:15 a.m., Plaintiff contacted the

OEIG and sent the following message along with supporting documents:

> I enclosed a copy of the commodities money. This money is for the class (i.e. books,
> supplies)—not for gifts to give away to guests who visit the institution.  Please
> advise—I do not want to put myself in a position to lose my position.  Thanks.

Later in the afternoon on April 8, 2009, Calloway and Warden Keith Anglin

("Anglin") visited Plaintiff's classroom.  At the time Calloway and Anglin entered the

classroom, Plaintiff was working in her office working on attendance sheets—one of her job

responsibilities.  Plaintiff noticed that Calloway and Anglin had entered her classroom and

walked over to the computer, which is where they were standing.  Calloway was standing

over the shoulder of an inmate who was playing solitaire on the computer—an activity that is

not allowed for inmates in classrooms.  Although it is disputed exactly what was said

between Plaintiff, Calloway and Anglin, the group eventually went into Plaintiff's office.

Anglin directed Plaintiff to prepare a ticket against the inmate and to complete an incident

report, which Plaintiff agreed to do.  The parties dispute what occurred next.  Plaintiff

testified in her deposition that Calloway asked her about the birdhouses and Plaintiff then

informed Calloway and Anglin that she felt it was unethical for her classroom funds to be

used for the birdhouses and informed them that she had complained about it and that it was being investigated.  Calloway and Anglin deny that any such discussion occurred at this time.

Later that afternoon, the computers were removed from Plaintiff's classroom by Kathy Paltridge ("Paltridge").  Paltridge completed an incident report and reported that Plaintiff had accused Calloway and Anglin of helping the inmate play solitaire in her classroom.  Plaintiff completed an incident report which included an assertion that Calloway made statements to the inmate that the inmate had missed a solitaire move.  After Virgil Tutwiler ("Tutwiler") received the incident report completed by the Plaintiff, he instructed Plaintiff to revise her report, omitting the language referring to Calloway's "advice" to the inmate.  Tutweiler also completed an incident report and reported that Plaintiff had accused Calloway and Anglin of helping the inmate play solitaire in her classroom.

Additionally, at 3:33 p.m. on this same afternoon, Calloway sent an email to Nichols advising LLC that the request to build birdhouses should be disregarded because Calloway did not want the birdhouses built if it violated LLC policy.  Importantly, the email also included the following statement: "I had a conversation with [Plaintiff] today and she informed me that it's against policy or illegal to build or construct" birdhouses.

### III.  Coworker Allegation

On April 9, 2009, Sergeant Bonita Barber ("Barber") met with Anglin.  Barber informed Anglin that Sergeant Star Burson ("Burson") reported to her that: (1) Plaintiff approached Burson on March 23, 2009 at 10:45 a.m., and suggested that Burson make false

allegations of sexual harassment by Calloway;[3] and (2) Plaintiff offered to corroborate Burson's false claims of sexual harassment.[4]  Anglin instructed Barber to complete a incident report regarding this matter, which she did.  After having this issue brought to his attention, Anglin met with Burson to discuss her allegations regarding Plaintiff.  Burson provided the same story to Anglin that she had previously told Barber.  Anglin instructed Burson to complete a incident report regarding this matter, which she did.  Anglin never discussed the allegations made by Burson with Plaintiff, who adamantly denies Burson's allegations and explains that she has never had <u>any</u> conversation with Burson.[5]

### IV.  Plaintiff's Stop Order & Employment Impact

After considering the allegations made by Burson—an individual who Anglin fully admits is not credible—Anglin made the decision to enter a stop order[6] against Plaintiff and contacted his superiors to receive permission to enter the stop order.  On April 13, 2009, after receiving permission to enter the stop order, Plaintiff was informed that she was being locked

---

[3]The apparent rationale for why Plaintiff allegedly suggested that Burson make these false allegations was that Burson was under investigation at the time for fraternizing with the family of an inmate.  After the investigation was complete into Burson's activities, Burson was told that she could resign or be fired—Burson chose to resign.

[4] It is undisputed that <u>if</u> Plaintiff did in fact originate and offer to corroborate false claims of sexual harassment, she would have violated Institutional Directives and Rules of Conduct.

[5]Additionally, Plaintiff argues that the timing of the claimed encounter with Burson could not be accurate because Plaintiff's students were never released until at least 11:00 a.m.—thus Plaintiff could not have been out of her classroom.

[6]The stop order in question bars Plaintiff from entering DCC.  A lockout prohibits an employee, visitor, or contractual worker from entering the prison facilities.

out of DCC.  At this time, Plaintiff was unaware that there had been any allegations made against her for violating DCC regulations.[7]  On April 16, 2009, Plaintiff received a letter from the DOC advising her that she had been permanently restricted from accessing any DOC facility in the State of Illinois.  This letter also explained that Plaintiff had a right to request a review of the stop order only "after a period of six months."[8]

On May 11, 2009, the LLC Board of Trustees voted to terminate Plaintiff's employment on the recommendation of James Hull ("Hull").  Hull, in making his recommendation to the LLC Board of Trustees, recommended Plaintiff's termination solely because the stop order, entered by the DOC, prevented Plaintiff from performing the job LLC had hired her to perform.  Hull did not consider whether the reasons given for the stop order were meritorious.  Because Plaintiff was tenured with LLC, she could be terminated only "for cause."  Therefore, on August 26, 2009, Plaintiff received a hearing before arbitrator Steven Befort ("Befort").  On November 23, 2009, Befort issued his decision that LLC had just cause to dismiss Plaintiff explaining, in part, that "[t]he termination documents clearly establish that [LLC] discharged [Plaintiff] solely because of the Stop Order issued by the DOC, rather than because of an independent assessment of the behavior that resulted in the Stop Order."  Befort noted that "[w]hile it is undisputed that the DOC did not conduct an investigation to determine the accuracy of [Plaintiff's] alleged discussion with the female sergeant, this is not an omission that should be held against [LLC]."

---

[7] In fact, Plaintiff was not aware of the allegations made by Burson until August 2009.

[8] Illinois law requires that individuals subjected to a stop order be advised that they have a right to request a review of the stop order after six months.

6

On December 30, 2009, Plaintiff sent a letter to Jim Reinhart ("Reinhart") formally requesting that the DOC review the stop order that had been entered against her on April 16, 2009.  Plaintiff, as part of this request, explained that she had not had the opportunity to defend herself against the allegations made against her and requested that the stop order be rescinded because she was seeking employment with a federal correctional facility but the stop order would prevent her from passing the required background check.  Plaintiff sent a second letter on January 25, 2010, once again requesting that the stop order be rescinded.

On January 6, 2010, Reinhart sent an email to Anglin and Cory Foster ("Foster") requesting background information about Plaintiff's stop order.  On January 7, 2010, Anglin responded that the stop order was issued "because of [Plaintiff's] conduct inside the facility trying to influence other staff to lie on myself and [Calloway]."  Reinhart responded to Anglin's email inquiring as to whether an investigation had been conducted.  Anglin responded that there had not been an investigation but that there were incident reports from the staff involved in the incident.  It is unclear exactly what further investigation occurred with respect to Plaintiff's request to review the stop order.  Reinhart, in his deposition, testified that Foster made the decision to deny the request and could not recall if he offered an opinion on the request.  Foster, in his deposition, testified that he was not involved in the decision of whether or not the stop order should be lifted.  Nevertheless, on February 8, 2010, Plaintiff received a letter advising her that they had reviewed her request and were unable to rescind the stop order.  No explanation as to why Plaintiff's request was denied was provided

in the letter, and the three sentence letter concluded with: "I trust this is responsive to your request."[9]

In the time since Plaintiff was terminated from LLC, she has applied for two teaching related positions at Danville Area Community College for construction trades and as a Coordinator for Danville Community College.  Plaintiff has not applied for any other teaching positions and has not applied to work as an educator in the department of corrections in any other state.

### V. Reasons Provided for Plaintiff's Stop Order

Defendants concede that Anglin has been inconsistent in his explanations for why a stop order was entered against Plaintiff.  Although Anglin has always stated that at least part of the justification for the stop order was the allegation made by Burson,[10] the remainder of the explanation has not been consistent (however, they also have not necessarily been contradictory).  For instance, at the disciplinary hearing held on August 26, 2009, Anglin acknowledged that a stop order would not have been entered against Plaintiff solely for contraband found in her classroom.[11]  In his email to Reinhart on January 7, 2010, Anglin

---

[9]This court finds this particular language to be strikingly inappropriate, considering Plaintiff's sincere request to review the stop order and the utter lack of any justification provided in the letter for continuing the stop order.

[10]Contractual employees at DCC are obligated to comply with DCC's rules of conduct, which in part provide that "[e]mployees are required to provide truthful information, verbal or written, to all other employees at all times."

[11]Contractual employees at DCC are obligated, when they observe an inmate in violation of any rule or regulation, to correct the behavior, counsel the inmate, and/or write a disciplinary report on the offender.

explained that the stop order was issued solely because of Plaintiff's alleged comments to

Burson, and made no mention of any other contributing factor for the stop order.  Finally, in

Anglin's interrogatory answer, he explained that:

> The stop order was entered against [Plaintiff] because she encouraged at least one prison employee, [Burson], to corroborate and originate false accusations of sexual harassment against [Calloway].  This action violated Department policy, Department Administrative Directives. [Plaintiff] also allowed inmates to possess contraband in her vocational classes, including computer games and magazines.

## VI.  Other Stop Orders

Between May 2008 and September 2011, DCC issued stop orders to twelve

contractual employees, including Plaintiff.  Seven of these stop orders were issued because

the contractual employees had resigned or were terminated from their employment with the

contractor—a standard procedure for such employees.  The remaining five contractual

employees, including Plaintiff, were all locked out because of allegations that they had

engaged in inappropriate conduct.  The first employee, Anna Kurhajec was accused of being

too close to an inmate and when she was asked about these allegations, she decided to resign

from her position.

When allegations of inappropriate conduct arose relating to the three other contractual

employees—Bruno Davis ("Davis") (male), Stephanie Georges (female) and Heather Gill

(female)—there was an investigation conducted by the facility.  A "facility investigation"

includes, in addition to other aspects, "obtaining statements from all involved individuals"

and "obtaining statements from all known and possible witnesses, even if nothing was

observed by the individual."  Davis, the only male contractual employee who had a stop

order entered against him, allegedly was engaging in financial transactions with a girlfriend

of an inmate.[12]  After this allegation was received, a complete investigation was conducted by

internal affairs.  After this investigation was complete, Davis' telephone records established

that the allegations were true and Davis resigned.

## PROCEDURAL BACKGROUND

On October 15, 2010, Plaintiff filed a Complaint (#1) against the Defendants.

Plaintiff's Complaint (#1) contained three counts: (1) Count I[13] alleges a due process

violation; (2) Count II[14] alleges a equal protection violation on the basis of gender; and (3)

Count III[15] alleges retaliation in violation of the First Amendment.  On January 31, 2011,

Defendants filed a Motion to Dismiss (#12) and their Answer (#13).  On April 25, 2011,

Magistrate Judge David G. Bernthal entered a Report and Recommendation (#20) on

Defendants Motion to Dismiss (#12).  On May 19, 2011, this court entered an Order (#21)

accepting Magistrate Judge Bernthal's Report and Recommendation (#20).  As a result of the

Order (#21), Michael Randle was dismissed from this case and Count III was dismissed

against all Defendants except for Anglin.

On November 30, 2011, Defendants filed a Motion for Summary Judgment (#25) and

---

[12]Additionally, at some point prior to this allegation, contraband was found in Davis's classroom.  No stop order was entered against Davis for this contraband.

[13]Plaintiff named Anglin, Reinhart, Randle and Taylor as defendants on Count I.

[14]Plaintiff solely named Anglin as a defendant on Count II.

[15]Plaintiff initially named Anglin, Reinhart, Taylor and Foster as defendants on Count III.

a Memorandum in Support (#26) with supporting exhibits.  On January 5, 2012, Plaintiff

filed a Memorandum of Law in Opposition to Summary Judgment (#31).  On January 25,

2012, Defendants filed a Reply (#33).

## ANALYSIS

## I.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a

motion for summary judgment, a district court "has one task and one task only: to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a

trial."  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In making this

determination, the court must construe the evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303,

213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  Speculation, however, is not the source of a

reasonable inference.  See Burwell, 213 F. Supp. 2d at 929 (citing Chmiel v. JC Penney Life

Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998)).

Therefore, the nonmoving party cannot rest on mere allegations or denials to

overcome a motion for summary judgment; "instead, the nonmovant must present definite,

competent evidence in rebuttal."  Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th

Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party

must show what evidence it has that would convince a trier of fact to accept its version of events."  Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial."  Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.  Conclusory allegations not supported by the record are not enough to withstand summary judgment.  Basith v. Cook Cnty., 241 F.3d 919, 928 (7th Cir. 2001).

Nevertheless, uncorroborated testimony from the non-movant, even if self-serving, can be evidence of disputed material facts and therefore prevent summary judgment, as long as such testimony is based on personal knowledge or firsthand experience.  Berry v. Chicago Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010).  Moreover, "[i]t is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders."  Id.

## II.  DUE PROCESS VIOLATION

Plaintiff alleges that Defendants deprived her of her liberty rights without due process of law.  To establish a procedural due process claim, Plaintiff must initially demonstrate that she was deprived of a constitutionally protected interest in life, liberty or property.  Belcher v. Norton, 497 F.3d 742, 750 (7th Cir. 2007).  If Plaintiff is able to demonstrate such a deprivation, then this court must consider the process that Plaintiff was entitled to.  Id.

Initially, it is undisputed that Plaintiff does not have a liberty interest in the form of the "right to work for a living in the common occupations of the community . . . ."  Becker v.

12

Illinois Real Estate Admin. & Disciplinary Bd., 969 F.2d 273, 957 (7th Cir. 1989)

(explaining that certain professionals in certain "common occupations" such as attorneys,

police officers, physicians and teachers have a liberty interest in their chosen occupation).

The Seventh Circuit has explained that "an individual who successfully satisfies the

statutorily mandated educational requirements for a professional license and who passes a

state-sponsored examination has a protected interest in pursuing his profession." DeSalle v.

Wright, 969 F.2d 273, 277 (7th Cir. 1992). In this case, although Plaintiff taught in a

correctional facility, it is undisputed that she did not pass a state-sponsored examination to

pursue her teaching role and did not have to meet statutorily mandated educational

requirements for a license to teach in a correctional facility. Therefore, Plaintiff is unable to

demonstrate a liberty interest in the right to work in the "common occupations of the

community." Becker, 969 F.2d at 957.

Alternatively, Plaintiff argues that she is able to establish an occupational liberty

claim—specifically a claim that arises when "after an adverse employment action, a public

employer stigmatizes the employee by making public comments impugning [her] good name,

honor, or reputation or imposes a stigma that forecloses other employment opportunities."

Palka v. Shelton, 623 F.3d 447, 454 (7th Cir. 2010). Plaintiff is required to demonstrate the

following elements to successfully establish an occupational liberty claim: "(1) the defendant

made stigmatizing comments about [her]; (2) those comments were publically disclosed; and

(3) [she] suffered a tangible loss of other employment opportunities as a result of the public

disclosure." Id. Defendants argue that Plaintiff is unable to establish any of the required

elements and therefore her due process claim must fail.  This court finds that Plaintiff is unable to demonstrate the third required element, therefore this court does not need to consider whether Plaintiff has demonstrated the other two elements.

The Seventh Circuit requires "that a plaintiff's claim establish that [her] future employment opportunities have been curtailed so significantly that a liberty interest [is] implicated."  Townsend v. Vallas, 256 F.3d 661, 671 (7th Cir. 2001).  The Seventh Circuit has emphasized that "[i]t is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find new employment in [her] chosen field."  Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 531 (7th Cir. 2000) (internal citations and quotation omitted).

In Plaintiff's situation, the stop order has effectively prevented her from future employment as a construction trade instructor in correctional facilities, at least in Illinois.  Even if the stop order does in fact prevent her from obtaining employment as a construction trade instructor in any state or federal correctional facility, it is not "virtually impossible" for Plaintiff to find a job as a construction trade instructor.  Plaintiff has attempted to narrowly describe her "chosen field" in order to meet the required elements of an occupational liberty claim.  Specifically, Plaintiff describes her chosen field as an instructor in a correctional facility.  However, this court believes that this is much too narrow of a field to constitute a deprivation of a liberty interest.  See e.g., Townsend, 256 F.3d at 671-72 (rejecting argument that an inability to work as a swim instructor for the Chicago school system sufficiently

infringed on a liberty interest when plaintiff had many other potential employment opportunities as a swim instructor).  Plaintiff has not alleged, and does not appear, to be foreclosed from working as an instructor in <u>any</u> setting outside of correctional facilities.  For example, Plaintiff worked as an electronics and vocational math instructor at Danville Area Community College prior to her employment with LLC.  Plaintiff has failed to demonstrate how such employment opportunities in her chosen field have been significantly curtailed.

In conclusion, Plaintiff has failed to demonstrate that she was deprived of a constitutionally protected liberty interest in one of the common occupations of the community or under an occupational liberty theory.  This court, therefore, does not need to consider the issue of what process Plaintiff was entitled to prior to the entry of the stop order. Accordingly, Defendants Anglin, Taylor and Reinhart are entitled to summary judgment on Plaintiff's procedural due process claim.

## II.  GENDER DISCRIMINATION CLAIM

Plaintiff's claim of gender discrimination is not based on Title VII, as is normally the case when employment is involved, but rather is based on an alleged equal protection violation of Plaintiff's Fourteen Amendment rights.[16]  In Plaintiff's Complaint (#1), she explains that the basis for her gender discrimination claim is that other male contractual employees of DCC were also found to have contraband in their classrooms but did not have stop orders entered against them as a result.  At this point, it is clear that the contraband, by

---

[16]Despite this distinction, the Seventh Circuit has explained that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."  <u>Williams v. Seniff</u>, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

itself, was not the reason a stop order was entered against the Plaintiff. Therefore, Plaintiff, in her Response (#31), albeit unclearly, argues that the denial of equal protection was a disparity in the level of investigation conducted by DCC prior to the entry of a stop order against her. Specifically, Plaintiff argues that Davis, another contractual employee who taught vocational classes at DCC, was treated differently when, after allegations were made against him, a full investigation was conducted by the internal affairs division prior to the decision to enter a stop order. Importantly, Plaintiff and Davis suffered the same fate—the eventual entry of a stop order—therefore, this court's analysis of Plaintiff's equal protection claim will focus on process leading up to the stop order.

Plaintiff concedes that she has no direct evidence of gender discrimination and therefore proceeds solely under the indirect method to establish her claim. To succeed on her claim of equal protection under 42 U.S.C. § 1983, Plaintiff must demonstrate that she (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; and (4) was treated differently from members of the unprotected class.[17] Seniff, 342 F.3d at 778. If the Plaintiff is able to establish these elements of the *prima facie* case, the burden then shifts to Defendant Anglin[18]

_____

[17]Although a fifth element—that the defendant acted with discriminatory intent—is sometimes included as a required element, see e.g., McPhaul v. Board of Commissioners of Madison County, 226 F.3d 558, 564 (7th Cir. 2000), the Seventh Circuit has explained that this element is a redundancy and does not need to be established. See Seniff, 342 F.3d at 788. Additionally, Defendant Anglin has not argued that Plaintiff needs to establish that he acted with discriminatory intent, therefore this court will not include it as a fifth required element.

[18]Defendant Anglin is the only defendant named on Plaintiff's gender discrimination claim.

to produce evidence of a legitimate, nondiscriminatory reason for the alleged discriminatory action.  Id.  If Defendant Anglin is able to satisfy this burden, the Plaintiff must then establish that the nondiscriminatory reasons offered by Defendant Anglin are pretextual.  Id.

### A.  Prima Facie Case

In this case, Defendant Anglin has conceded that Plaintiff, as a female, was a member of a protected class.  Defendant Anglin initially argued that Plaintiff cannot establish that she suffered an adverse action because LLC, not Defendant Anglin, terminated her employment.  However, the adverse action alleged by Plaintiff was not her termination by LLC, but instead was the process by which a decision was made by Defendant Anglin to enter a stop order against her—an action that had an adverse impact on Plaintiff.  Additionally, Defendant Anglin has conceded that the allegations of rule violations made against Davis, a male employee, were fully investigated while Plaintiff's situation was not fully investigated—a sufficient difference in treatment to satisfy the *prima facie* requirement.  Therefore, the remaining disputed element of the *prima facie* case is whether Plaintiff has demonstrated that she is similarly situated to a male contractual employee at DCC.

Plaintiff argues that Davis is a similarly situated male contractual employee and that he received different treatment than the Plaintiff.  Davis was also a LLC instructor who taught vocational classes at DCC.  Defendant Anglin focuses on one distinction that he argues is sufficient to find that Davis was not similarly situated—the fact that Davis was given a stop order for fraternization, whereas Plaintiff was given a stop order for allegedly encouraging false allegations of sexual harassment.  As a general rule, an employee is

17

"similarly situated if they are directly comparable in all <u>material</u> respects." <u>Raymond v.</u>

<u>Ameritech Corp.</u>, 442 F.3d 600, 610 (7th Cir. 2006).  Although there are numerous examples

where the distinction in conduct between the compared employees is material, in this case,

this court does not believe that the distinction in the conduct Plaintiff and Davis were alleged

to have been involved in is material.  Plaintiff's alleged encouragement of false allegations

and Davis's alleged fraternization were both violations of DCC rules, and if true, would be

appropriate grounds for the entry of a stop order.  This court does not believe that the

distinction between these rule violations would justify a difference in the appropriate

investigation prior to the entry of a stop order.  Accordingly, Plaintiff has establish the

required elements of the *prima facie* case.

## B.  Pretext

Assuming Defendant Anglin was able to offer a legitimate, nondiscriminatory reason

for failing to conduct a full investigation into the alleged violations by Plaintiff prior to

entering a stop order, Plaintiff must then attempt to show that his stated reasons for the

adverse employment action are pretextual.  The Seventh Circuit has explained that "[t]o show

pretext, 'a plaintiff must show that (a) the employer's nondiscriminatory reason was

dishonest; and (b) the employer's true reason was based on a discriminatory intent.'" <u>Perez</u>

<u>v. Illinois</u>, 488 F.3d 773, 777 (7th Cir. 2007).  In other words, Plaintiff must demonstrate that

the Defendant Anglin's explanation is false and gender discrimination was in fact the real

reason for the adverse employment action.  Plaintiff has no direct evidence of pretext—in

other words, Plaintiff has failed to offer evidence that Defendant Anglin has admitted that his

stated reasons were dishonest and that the decision was actually based on gender

discrimination.  Therefore, she must rely on indirect evidence to demonstrate pretext.

To demonstrate pretext with indirect evidence, Plaintiff: (1) must "show that the

employer's reason is not credible or that the reason is factually baseless;" and (2) must

"provide evidence of at least an inference that the real reason for the [adverse employment

action] was discriminatory."  Perez, 488 F.3d at 778 (citations omitted); see also McGowan,

581 F.3d at 581.  Although case law is varied, to survive summary judgment, the "plaintiff

need only offer evidence that supports an inference that the employer's nondiscriminatory

reason for its action was dishonest."  E.E.O.C. v. Target Corp., 460 F.3d 946, 960 (7th Cir.

2006).  Additionally, if an employer "gives one reason at the time of the adverse employment

decision but later gives another which is unsupported by the documentary evidence, a jury

could reasonably conclude that the new reason was a pretextual, after-the-fact justification."

O'Neal v. City of New Albany, 293 F.3d 998, 1005–06 (7th Cir. 2002).

As an initial matter, it is not clear that Defendant Anglin has offered a

nondiscriminatory reason for failing to investigate the allegations against Plaintiff prior to

entering a stop order against her.[19]  Nevertheless, even if this court focuses on the stated

reasons for entering the stop order, Plaintiff has offered sufficient circumstantial evidence of

pretext in this case.  Specifically, this court believes that the following factors demonstrate

that Defendant Anglin's stated reasons are not credible: (1) the fact that Defendant Anglin

---

[19] Although Defendant Anglin does provide nondiscriminatory reasons for entering
the stop order—the combination of contraband in her classroom and encouraging a co-worker
to make false claims of sexual harassment—the adverse action complained of is the lack of a
complete investigation into the allegations against Plaintiff.

admits that Burson is not a credible person but made no attempt to confront Plaintiff with the allegations against her or conduct any investigation into Burson's allegations; and (2) Defendant Anglin has been inconsistent in his explanation for the entry of Plaintiff's stop order. See O'Neal, 293 F.3d at 1005–06. Therefore, because this court finds that there is sufficient circumstantial evidence of pretext in this case, Plaintiff has successfully established a gender discrimination claim under the indirect method. Accordingly, this court denies Defendant Anglin's Motion for Summary Judgment (#21) on Plaintiff's gender discrimination claim.

### III.  RETALIATION FOR EXERCISING FIRST AMENDMENT RIGHTS

To establish a *prima facie* case of unlawful First Amendment retaliation, a plaintiff must establish that: "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) her speech was a motivating factor in her employer's adverse action." Valentino v. Villiage of S. Chicago Heights, 575 F.3d 664, 670 (7th Cir. 2009); see also Green v. Doruff, 660 F.3d 975, 977-78 (7th Cir. 2011). If the plaintiff is able to establish the *prima facie* case, "the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech." Id. Finally, if the employer is able to satisfy this burden, the plaintiff may be able to establish a genuine issue of material fact necessitating a trial "by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising her First Amendment rights." Id. Defendant Anglin concedes that Plaintiff

suffered a deprivation likely to deter her from exercising her First Amendment rights,

however he challenges her ability to carry her burden on each of the remaining elements.

### A.  Constitutionally Protected Speech

Defendant Anglin argues, as a threshold matter, that Plaintiff's claim must fail under

the Supreme Court's holding in Garcetti v. Ceballos, 547 U.S. 410 (2006).  In Garcetti, the

Supreme Court held that "when public employees make statements pursuant to their official

duties, [they] are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline."  Id. at 421.

Therefore, public employees do not have a "cause of action for First Amendment retaliation

unless they were disciplined for speaking as citizens about a matter of public concern."

Spiegla v. Hull, 481 F.3d 961, 963 (7th Cir. 2007).  As a result, Defendant Anglin is correct

that if Plaintiff's statements were made pursuant to her official duties as an instructor, the

statements were not protected and her claim for retaliation would fail as a matter of law.  See

id. at 964.

Plaintiff, in response, argues that Garcetti does not bar her retaliation claim because:

(1) she was an independent contractor, not a state employee; and (2) her speech was not made

pursuant to her official duties.  First, although Plaintiff's assertion that she is an independent

contractor is accurate—Plaintiff undisputedly was an employee of LLC, not the State of

Illinois—Garcetti still applies to Plaintiff's claim.  Unfortunately for the Plaintiff, the

Supreme Court has already determined that the appropriate analysis for considering

retaliation claims as the result of exercising First Amendment rights is the same for

21

government employees and independent contractors.  See Bd. of Cnty. Comm'rs v. Umbehr,

518 U.S. 668, 684-85 (1996) ("Independent government contractors are similar in most

relevant respects to government employees . . . . We therefore conclude that the same form of

balancing analysis should apply to each.").  Although Umbehr was decided prior to Garcetti,

no court has found that the holding in Umbehr is affected by Garcetti.  See, e.g., Jacobson v.

Schwarzenegger, 650 F. Supp. 2d 1032, 1054 (C.D. Cal. 2009).

Second, this court must determine whether or not Plaintiff spoke in her capacity as a

private citizen or as an employee.  See, e.g., Chaklos v. Stevens, 560 F.3d 705, 711-12 (7th

Cir. 2008) ("Garcetti requires a threshold determination regarding whether the public

employee spoke in his capacity as a private citizen or as an employee.").  In making this

determination, the Seventh Circuit has explained that the court should "take a practical view

of the facts . . ., looking to the employee's level of responsibility and the context in which the

statements were made."  Abcarian v. McDonald, 617 F.3d 931, 937 (7th Cir. 2010) (citing

Tamayo v. Blagojevich, 526 F.3d 1074, 1092 (7th Cir. 2008).  For example, in Tamayo, the

Seventh Circuit emphasized that courts "must take into account the employee's level of

responsibility" when it held that a senior administrator of an agency was discharging the

responsibilities of her office when testifying before the legislature about alleged improper

political influence over the agency.  Tamayo, 526 F.3d at 1092.

Two other cases decided by the Seventh Circuit are particularly instructive to the issue

before this court.  See Ogden v. Atterholt, 606 F.3d 355 (7th Cir. 2010); Valentino, 575 F.3d

664.  First, in Valentino, the Seventh Circuit held that a municipal employee engaged in

constitutionally protected speech when she expressed her concerns about municipal

corruption to a member of the public.  <u>Valentino</u>, 575 F.3d at 672.  The Seventh Circuit

emphasized that it is "well-established that speech protesting government waste addresses a

matter of public concern and is therefore entitled to constitutional protection."  <u>Id.</u> at 671-72.

In a subsequent case, an employee attempted to use <u>Valentino</u> to support his claim that his

speech was protected because he argued that it also involved a misappropriation of funds.

<u>See</u> <u>Ogden</u>, 606 F.3d 355.  However, the Seventh Circuit rejected the plaintiff's argument

that he spoke outside of his role as an employee, explaining:

> [Plaintiff's] situation is completely different.  His memo was an internal, formal request to his ultimate supervisor asking that his department be reorganized.  It did not purport to expose or remedy injustices of public importance; its aim was to persuade [his supervisor] that [another supervisor] was an unsuitable supervisor of [his] division and convince him to remove the division from her control.

<u>Id.</u> at 360.  Similarly, in <u>Houskins v. Sheahan</u>, the Seventh Circuit distinguished between

speech to a supervisor and speech to the police on the same topic.  549 F.3d 480, 491 (7th

Cir. 2008).  In making this distinction, the Seventh Circuit cited the Ninth Circuit's

explanation:

> [A public employee's] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.

<u>Freitag v. Ayers</u>, 468 F.3d 528, 545 (9th Cir. 2006).

In this case, Plaintiff was asked to use funds allocated to her classroom to build

patriotic birdhouses for dignitaries in her shop class by Anglin and Calloway.  Plaintiff was

concerned that this was unethical and a misappropriation of funds, therefore she: (1)

discussed her concern with Anglin and Calloway on April 8, 2009; and (2) filed a complaint with the OEIG on April 8, 2009.  This court will consider each of these statements separately.  First, it is undisputed that Plaintiff had a duty, as part of her official job requirements, to report misappropriations of funds at DCC.  When Plaintiff expressed her concern to Anglin and Calloway, her supervisors at DCC, her statements were made pursuant to their official duties—therefore, her speech was not made as a citizen for First Amendment purposes.  See Garcetti, 547 U.S. at 421.  As a result, Plaintiff cannot succeed on her retaliation claim based on her statements to Anglin and Calloway.[20]

In contrast to the statements made directly to her supervisors, Plaintiff's complaint filed with the OEIG was not made pursuant to her official duties.  This complaint, which was made to an independent agency and involved a concern of governmental waste, was made in Plaintiff's capacity as a private citizen and therefore is not barred by Garcetti.  See e.g., Chaklos, 560 F.3d at 712 (explaining that although public employees might have a general duty to report certain anticompetitive practices, not every statement made relating to such practices is necessarily pursuant to their job duties);  Houskins, 549 F.3d at 491; Ogden, 606 F.3d at 360.

In addition to finding that Plaintiff's complaint filed with the OEIG was made in Plaintiff's capacity as an ordinary citizen, in order to be constitutionally protected speech, this court also must determine whether she was spoke on a matter of public concern.  See e.g., Chaklos, 560 F.3d at 712.  To make this determination, this court must consider "the

---

[20]Plaintiff concedes as much, stating in her Response (#31) that "Kinney is not claiming that her statements to Anglin and/or Calloway were protected."

24

content, form, and context of a given statement, as revealed by the whole record."  Connick
v. Myers, 461 U.S. 138, 147-48 (1983).  In this case, the complaint filed with the OEIG was
alerting the agency to possible misuse of funds—a concern which is generally a matter of
public concern.  See e.g., Chaklos, 560 F.3d at 713 ("It is by now well established that
speech protesting government waste addresses a matter of public concern and is therefore
entitled to constitutional protection.").  Although this court questions whether this particular
concern of misuse of funds—the use of funds allocated to a prison shop class for building
gifts for prison visitors— is highly significant, it does address a matter of public concern—a
conclusion which is not contested by Defendant Anglin.

Despite this court's conclusion that Plaintiff's complaint filed with the OEIG was
made in her role as a citizen and addressed a matter of public concern, this court's inquiry is
not complete.  Specifically, the government is entitled to restrict speech, even if it addresses a
matter of public concern, "if it can prove that the interest of the employee as a citizen in
commenting on the matter is outweighed by the interest of the governmental employer in
promoting effective and efficient public service."  McGreal v. Ostrov, 368 F.3d 657, 675-76
(7th Cir. 2004).  The Seventh Circuit has identified seven factors that should be considered as
part of this Pickering analysis:

> (1) whether the speech would create problems in maintaining discipline or harmony
> among co-workers; (2) whether the employment relationship is one in which personal
> loyalty and confidence are necessary; (3) whether the speech impeded the employee's
> ability to perform [his] responsibilities; (4) the time, place, and manner of the speech;
> (5) the context within which the underlying dispute arose; (6) whether the matter was
> one on which debate was vital to informed decision-making; and (7) whether the
> speaker should be regarded as a member of the general public.

25

Chaklos, 560 F.3d at 714-15.  Importantly, Defendant Anglin bears the burden of establishing that the disciplinary action that was taken is justified.  See id. at 715.

Defendant Anglin, in his attempt to meet this burden, simply argues that the Plaintiff's comments challenging the allocation of funds was potentially disruptive and may have jeopardized the safety and security of the institution because the comments were made in front of inmates (an assertion which is contested).  This argument must fail as it does not relate to the speech at issue here—the complaint filed with the OEIG—speech which certainly was not potentially disruptive within the prison.  Therefore, although the bird house dispute might not be particularly vital to informed decision making, Defendant Anglin has failed to explain how any of the factors this court should consider weigh in favor of justifying his ability to restrict Plaintiff's speech.  In conclusion, this court finds that Plaintiff's complaint filed with the OEIG was constitutionally protected speech.

### B.  Causation & Burden Shifting Analysis

The Seventh Circuit has explained that, in order to establish the "causation" element of the *prima facie* case for First Amendment retaliation at summary judgment, the plaintiff must:

> [P]roduce sufficient evidence to show that [the] purportedly protected speech was at least a motivating factor in the defendants' alleged retaliatory employment actions taken against [her]. [Plaintiff] may do so by presenting either direct or circumstantial evidence.  Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference of presumption.  Circumstantial evidence, however, is evidence from which a trier of fact may infer that retaliation occurred.  Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directing at other employees in the protected group.

Kidwell v. Eisenhauer, 679 F.3d 957, 965-66 (7th Cir. 2012).  In this case, Plaintiff relies upon circumstantial evidence for demonstrating causation between her protected speech and the stop order entered by Defendant Anglin.  Specifically, she argues that the timing of the stop order—only days after her protected speech—was suspicious and evidences a retaliatory motive.

Although suspicious timing, by itself, is not enough to establish causation, "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied."  Lalvani v. Cook County, Illinois, 269 F.3d 785, 790 (7th Cir. 2001).  The Seventh Circuit has explained that "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action."  Kidwell, 679 F.3d at 966.

Initially, this court notes that the protected speech at issue was the letter from Plaintiff to the OEIG—not the verbal complaint made by Plaintiff directly to Calloway and Anglin.  Accordingly, the focus is on whether the OEIG letter was at least a motivating factor in Defendant Anglin's decision to enter a stop order against Plaintiff.  Defendant Anglin contends that he were not aware of the OEIG letter sent by Plaintiff at the time that the stop order was entered.  However, Plaintiff, in her deposition, testified that she informed Calloway and Anglin on April 8, 2009, that she had complained about the birdhouse request and that it was being investigated.  This court is required to view this fact in the light most

27

favorable to the Plaintiff, therefore, this court will infer that Defendant Anglin was aware of the OEIG letter on April 8, 2009.  The stop order was entered on April 13, 2009, only 5 days after Defendant Anglin was informed that Plaintiff sent a letter to OEIG.  This court believes that this timing alone is sufficient to draw an inference of causation in this case between Plaintiff's letter to the OEIG and the stop order entered only five days later.  See Kidwell, 679 F.3d at 966-67 (collecting cases).  Accordingly, this court concludes that Plaintiff has met the *prima facie* case.

 At this point, the burden shifts to Defendant Anglin to demonstrate that he would have entered the stop order against Plaintiff in the absence of the protected speech.  Defendant Anglin has satisfied this burden by explaining that he entered the stop order due to the combination of discovering contraband in her classroom and the allegations that Plaintiff encouraged a co-worker to make false claims of sexual harassment.  Because Defendant Anglin has satisfied this burden, Plaintiff must produce sufficient evidence to allow a fact finder to determine that Defendant Anglin's stated reasons were merely a pretext for entering the stop order, at least in part, for Plaintiff's exercise of her First Amendment rights.  As this court previously concluded, Plaintiff has offered sufficient circumstantial evidence that Defendant Anglin's stated reasons for entering the stop order in this case were pretextual.[21]

 IT IS THEREFORE ORDERED THAT:

---

[21] This court explained that the following factors demonstrate that Defendant Anglin's stated reasons are not credible: (1) his admission that Burson is not a credible person, but relied upon the allegations without further investigation; and (2) he admits inconsistent explanations for Plaintiff's lock out.  These factors apply equally for Plaintiff's equal protection and First Amendment retaliation claims.

(1) Defendants' Motion for Summary Judgment (#25) is GRANTED in part and DENIED in part.

(2) Judgment is entered in favor of Defendants Keith Anglin, Gladyse Taylor and Jim Reinhart on Count I of Plaintiff's Complaint.

(3) Defendant Jim Reinhart is dismissed from the remainder of this suit, because he was only included as a Defendant on Count I.

(4) Defendant Cory Foster is dismissed from the remainder of this suit, because he was only included as a Defendant on Count III, which was dismissed against all Defendants except for Defendant Anglin in this court's Order (#21) entered on May 19, 2011.

(5) Plaintiff may proceed to trial on Count II & Count III alleged in her Complaint (#1).

(6) A status conference is scheduled in this court on September 28, 2012, at 2:30 p.m.

(7) The parties are directed to contact Magistrate Judge David G. Bernthal's chambers to schedule a settlement conference to be held prior to the status conference in this court on September 28, 2012, at 2:30 p.m.

ENTERED this 31st day of July, 2012

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE